## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **Venisha Beckford,** | |
| *Plaintiff,* | |
| v. | Case Number: |
| **Niibin, LLC,**<br>**LDF Holdings, LLC,**<br>**Jessi Lee Phillips Lorenzo,**<br>**Infinity Enterprise Lending Systems,**<br>**Christopher James Leyva,**<br>**Dean Financial Group, LLC,**<br>**Preferred Call Services, LLC,**<br>**James M. Bartlett,** *and*<br>**Clarity Services, Inc.,** | Ad Damnum: **$10,846 + Atty Fees and Costs**<br><br>**JURY TRIAL DEMANDED** |
| *Defendants.* | |

## <u>COMPLAINT & DEMAND FOR JURY TRIAL</u>

COMES NOW the Plaintiff, **Venisha Beckford** ("**Ms. Beckford**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Niibin, LLC** ("**Niibin**"), **LDF Holdings, LLC** ("**LDF Holdings**"), **Jessi Lee Phillips Lorenzo** ("**Lorenzo**"), **Infinity Enterprise Lending Systems** ("**Infinity**"), **Christopher James Leyva** ("**Leyva**"), **Dean Financial Group, LLC** ("**Dean Financial**"), **Preferred Call Services, LLC** ("**Preferred Call Services**"), **James M. Bartlett** ("**Bartlett**"), and **Clarity Services, Inc.** ("**Clarity**") (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action brought by Ms. Beckford against the Defendants for violations of the ***Florida Consumer Collections Practices Act***, Section 559.55, Florida Statutes, *et seq.* ("**FCCPA**"), Florida's ***Civil Remedies for Criminal Practices Act***, Section 772.101, Florida Statutes, *et seq.* ("**CRCPA**"), and the ***Fair Credit Reporting Act***, 15 U.S.C. § 1681, *et seq.* ("**FCRA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, the FCCPA, Section 559.77(1), Florida Statutes, the CRCPA, Section 772.104, Florida Statutes, and 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction for Ms. Beckford's state law claims pursuant to 28 U.S.C. § 1367.

4.      The Defendants are subject to the provisions of the FCCPA, the CRCPA, and the FCRA, and to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

5.      Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action occurred within this District.

6.      Defendants operate an interactive website – CashAisle.com – which offers loans at annual interest rates of 500% and higher.

7.      Many of these loans are made to Florida residents, including Ms. Beckford, who receive funds wired by the Defendants into bank accounts located in Florida, and have payments debited by Defendants from these Florida bank accounts.

8.      The use of an interactive website combined with additional evidence of purposeful availment is sufficient to establish personal jurisdiction over a defendant in the forum state. Toys "R" Us, Inc., v. Step Two, 318 F.3d 446, 454 (3rd Cir. 2003).

## PARTIES

### Ms. Beckford

9.      **Ms. Beckford** is a natural person residing in the City of Lakeland, Polk County, Florida, and a *Consumer* as defined by the FCRA, 15 U.S.C. § 1681a(c), and the FCCPA, Section 559.55(8), Florida Statutes.

### LDF Holdings

10.     **LDF Holdings** claims to be a wholly owned subsidiary of the ***Lac du Flambeau Band of Lake Superior Chippewa Indians*** (the "**LDF Tribe**").

11.     The LDF Tribe claims that LDF Holdings operates from the second floor of a cigarette store called the Smoke Shop, located at **597 Peace Pipe Road, Lac du Flambeau, WI 54538. SEE PLAINTIFF'S EXHIBIT A.**

### Niibin

12.     **Niibin**, doing business as **Cash Aisle** (sometimes spelled **Cash Ai$le**), is a limited liability company that conducts online lending via its website, www.cashaisle.com.

13.     Niibin claims to be a wholly owned subsidiary of LDF Holdings.

14.     Niibin does business in Hillsborough County over the internet, via text message, via *Automated Clearing House* ("**ACH**") transactions, and over the telephone.

**Lorenzo**

15.     **Lorenzo** is a natural person.

16.     According to her LinkedIn profile, as well as information posted on LDF Holdings' website, Lorenzo is the president of LDF Holdings despite not being a member of the LDF Tribe. **SEE PLAINTIFF'S EXHIBITS B and C.**

17.     Lorenzo resides at **502 S. Fremont Ave., Apt. 1107, Tampa, FL 33606**.

**Infinity and Leyva**

18.     **Infinity** is a business which operates at **4864 Sparks Blvd., Sparks, NV 89436.** The true name of Infinity may be different than "Infinity Enterprise Lending Systems" as Plaintiff now believes it to be. In the event that Infinity's true name is otherwise, Plaintiff will amend her complaint once Infinity's true name is learned.

19.     **Leyva** is a natural person and the CEO and owner of Infinity and its related subsidiaries**.** He resides at **2565 Old Waverly Ct., Sparks, NV 89436**

**Dean Financial, Preferred Call Services and Bartlett**

20.     **Dean Financial** is a Florida limited liability company with a principal address of **2158 SW Balata Terrace, Palm City, FL 34990**.

21.     **Preferred Call Services** is a Nevada limited liability company registered with the Florida Secretary of State, with a principal address of **2158 SW Balata Terrace, Palm City, FL 34990.**

22.     **Bartlett** is a natural person, the owner and registered agent of both Dean Financial and Preferred Call Services, and the beneficial owner of the online payday website cashaisle.com. He resides at **2158 SW Balata Terrace, Palm City, FL 34990.**

<u>**Clarity**</u>

23.     **Clarity** is a Delaware corporation with a primary business address of **15550 Lightwave Drive, Suite 350, Clearwater, FL 33760.**

24.     Clarity is registered to conduct business in the State of Florida, where its Registered Agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324**.

25.     Clarity is a nationwide ***Consumer Credit Reporting Agency*** ("**CRA**") within the meaning of 15 U.S.C. § 1681a(f), in that, for monetary fees, dues, or on a cooperative nonprofit basis, it regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses means or facilities of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including mail and telephone communications.

<u>**FACTUAL ALLEGATIONS**</u>

<u>**Bartlett's Usurious Lending via Cash Aisle**</u>

26.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

27.     Section 687.071(3), Florida Statutes, renders the issuing of loans with annual interest rates greater than 45% a third-degree felony.

28.     Section 687.071(7), Florida Statutes, states: "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

29.     Thus, any person who willfully makes such a loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

30.     Indeed, even the recovery of the principal balance made at usurious rates is impermissible under Florida law. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

31.     The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*,190 So.2d 415 (Fla. 2d DCA 1966).

32.     Cash Aisle is an online payday lender operating from cashaisle.com, which offers loans to consumers at annual interest rates in excess of 500% annually.

33.     As such, loans made by Cash Aisle to consumers in Florida are in violation of Florida's usury statutes.

34.     Typically, Cash Aisle's borrowers are charged 788% annual interest. As an example, at this interest rate, an **$800** loan would result in interest of $4,419.83 and total repayment of **$5,219.83** for a **10-month** loan.

35.     According to cashaisle.com, its loans are offered by Niibin, LLC, which is owned by the LDF Tribe and, purportedly, has its offices at 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538. With its tribal ownership, Niibin *claims* it has sovereign immunity from criminal prosecution regarding its lending practices, which constitute felonies in many states, including Florida.

36.     However, the idea that Cash Aisle is "tribally" owned is utter fiction. As detailed further below, non-tribal investors are the true beneficial owners of Niibin and its related lending websites. The LDF Tribe simply claims ownership of the website as part of a "rent-a-tribe" scheme, and its involvement in the lending business is nothing more than superficial. Its primary contribution is providing a cloak of sovereign immunity as straw owners, giving the true owners protection from criminal and civil charges.

## **Bartlett's Role in the Payday Lending Industry**

37.     Bartlett has been a loan shark since the 1990s, initially operating storefront payday lenders in Illinois.

38.     In the early 2000s, Bartlett expanded to New Mexico, because, as he explained in a deposition, "there was no usury cap" in the state. *State of New Mexico v. B&B Investment Group d/b/a Cash Loans Now,* Docket 34,266, Supreme Court of New Mexico, June 26, 2014.

39.     For a number of years, Bartlett attempted to outfox state regulators who sought to crack down on abusive lending practices like the ones in which Bartlett engaged. For example, in 2005, after Illinois enacted the Payday Reform Act, Bartlett rebranded his company's loans as "signature loans." Bartlett did the same in New Mexico right before the state implemented payday loan reforms in 2007.

40.     In 2014, Bartlett and his prior company, B&B Investment Group, Inc., which did business as Cash Loans Now, were sued by the New Mexico State Attorney General for unconscionable business practices. Among other allegations recounted by the attorney general was that Bartlett's operations collected $991 on a $100 loan made at 1,147% annual interest from a grocery store worker who did not complete the ninth grade. In defense of the suit, Bartlett's expert posited that the loans were legal, stating that because there was no interest rate cap in New Mexico, then no interest rate should violate public policy – even an interest rate of 11 million percent should be legal. As a further extension of this argument, Bartlett's expert said it would be acceptable for a borrower to agree to harvest a kidney in exchange for $100.

41.     Ultimately, the court found that while there was no *per se* interest rate cap on loans under New Mexico law, Bartlett's behavior was unconscionable, and unconscionable business practices did run afoul of the law.

42.     Bartlett viewed the court's decision as only a minor setback and pivoted to another method of evading state usury laws, making a "rent-a-tribe" deal with the LDF Tribe.

43.     In this deal, the LDF Tribe claims to own and operate Bartlett's online payday lender Cash Aisle, purporting to make Cash Aisle an "arm of the tribe" and thus protected from state usury laws under the cloak of the LDF Tribe's sovereign immunity. In exchange for the use of its name, the LDF Tribe is paid about 2 cents for every dollar of profit made by the lender.

### Origins of LDF Holdings and Tribal Payday Loan Operations

44.     In 2008, the LDF Tribe issued $50 million in bonds and entered into a Trust Indenture to refinance and consolidate debts associated with the Lake of the Torches Casino Facility, and to build a riverboat casino, hotel and Bed & Breakfast. *Wells Fargo Bank N.A. v. Lake of the Torches Econ. Dev. Corp.* 677 F. Supp. 1056, 1057 (E.D. Wis. 2010).

45.     The project was "plagued with problems since it began" and never generated the income needed to pay the bonds. Instead, the LDF Tribe was not only unable to make the bond payments, but "was forced to reduce and eliminate many programs that [were] important to the health and welfare of the tribal members." *Id* at 1057-1058.

46.     The LDF Tribe attempted to restructure the bonds in 2009 but was unsuccessful.

47.     The LDF Tribe stopped making payments on the bond in 2009, alleging that its contract with its lender effectively created a management contract in violation of the Indian Gaming Regulation Act. *Id.* at 1059.

48.     In 2013, facing dire economic circumstances, the LDF Tribe looked for other ways to shore up its finances.

49.     In May 2013, the LDF Tribe set about establishing an internet lending operation which would offer short-term, high-interest-rate loans to consumers via the internet.

50.     However, given the LDF Tribe's poor economic situation and credit history, it was unable to obtain credit from traditional sources to fund its new payday lending enterprise.

51.     As of May 2013, the LDF Tribe had neither experience in payday lending, nor knowledge of how to underwrite, collect, or service payday loans.

52.     An article published in the LDF Tribe's newsletter, *Inwewin*, in July 2013 noted that the tribe had embarked on a new internet lending business. **SEE PLAINTIFF'S EXHIBIT D.**

53.     The July 2013 article stated that "the [LDF Tribe] has partnered with one of the largest and most experienced lending companies." *Id.*

54.     In fact, the LDF Tribe entered into agreements with several non-tribal owners of internet lending companies, including, without limitation, Bartlett, Preferred Call Services, and Dean Financial.

55.     For each of these agreements, the LDF Tribe, through its wholly owned subsidiary LDF Holdings, created an LLC, the operations of which were then turned over to its investors.

56.     In no case did the LDF Tribe manage, control, or operate the internet lending LLCs.

57.     Because the LDF Tribe, through LDF Holdings, initially created the LLCs, these companies appeared to be owned by the LDF Tribe and were thus ostensibly privileged with sovereign immunity from various state and federal lending laws that limit interest rates.

58.     Most of the LLCs are named after words in the LDF Tribe's native Ojibwe language to further the façade of tribal ownership, *e.g.,* Niibin means "summer."

59.     In exchange for the use of the LDF Tribe as a purported shield from US law, the investors in these LLCs agreed to pay the Tribe a small percentage – often less than 3% – of each loan they made to a consumer.

60.     The LDF Tribe, in essence, rented out its name, allowing others to conduct business under it.

61.     Brent McFarland, the LDF Tribe's director of business development, told the *Milwaukee Journal Sentinel* that "we're looking for ways to leverage (the tribe's) sovereignty" for profit. Cary Spivak, *Lac du Flambeau Chippewa enter payday loan business with eye to online gambling*, Milwaukee Journal Sentinel, Dec. 29, 2013, http://archive.jsonline.com/business/lac-du-flambeau-chippewa-enter-payday-loan-business-with-eye-to-online-gambling-b99164952z1- 237906421.html.

62.     Agreements under which a non-tribal company attempts to circumvent state and federal laws which would otherwise prohibit usurious loans, by licensing the tribe's name / identity, are commonly referred to as "rent-a-tribe" schemes.

63.     In "rent-a-tribe" schemes, the tribal lending entity is usually a mere "front" for what is actually an illegal lending scheme; the Native American tribe involved has no real part in the operations of the business, and all substantive aspects of the payday lending operations – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals unaffiliated with the Native American tribe.

64.     The LDF Tribe's internet lending operations were intended to lend money to consumers at astronomically high interest rates.

65.     Even the Tribe's July 2013 *Inwewin* article acknowledged that "some view payday loan and internet lending businesses as predatory, with companies taking advantage of individuals already in unpleasant financial situations." **SEE PLAINTIFF'S EXHIBIT D.**

66.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, Scott Tucker and Timothy Muir, who operated a network of tribal lending companies, were convicted on 14 felony counts in the U.S. District Court for the Southern District of New York. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y).

67.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact

"operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

### LDF Tribe Makes Myriad Deals to Rent its Sovereign Immunity

68.     Within a short period of time, the LDF Tribe became one of the most prolific purveyors in the rental market for sovereign immunity, making "rent-a-tribe" agreements with **over 50 different non-tribal investors**, both domestic and international – many of whom have their own history of questionable business practices.

69.     The LDF Tribe claims to own Ningodwaaswi, LLC ("**Ningodwaaswi**"), which does business as **Sky Trail Cash** and operates the website skytrailcash.com. Ningodwaaswi means "six" in Ojibwe.

70.     In reality, Sky Trail Cash is owned by Texas payday loan magnate William C. "Cheney" Pruett ("**Pruett**"), who public records show owns the barely disguised SkyTrail Servicing Group, LLC, in Texarkana, Texas. Nearly operating out in the open, Sky Trail Cash reports tradeline data on its loans to FactorTrust, Inc. ("**FactorTrust**"), a nationwide *Consumer Credit Reporting Agency* ("**CRA**"), under its own name and address in Texas.

71.     The LDF Tribe claims to own **Niswi, LLC** ("**Niswi**"), which, until recently, did business as **Amplify Funding** and operated the payday loan website amplifyfunding.com; Amplify Funding re-branded as LendUMo in early 2020 and now operates the payday loan website lendumo.com. Niswi means "three" in Ojibwe.

72.     LendUMo is beneficially owned by Andrew Dunn ("**Dunn**"), through his companies Soaren Management, LLC, and Kraken Holdings, LLC, both of which utilize a Phoenix, Arizona, address for their primary business address.

73.     Like Pruett, Dunn took little care to obfuscate his beneficial ownership of Niswi and, prior to consumer lawsuits in early 2020, reported tradeline data to FactorTrust under Niswi's name but with Soaren's email address, phone number, and Phoenix, Arizona, business address.

74.     The LDF Tribe claims to own **Niiwin, LLC**, which does business as **Lendgreen** and operates the payday loan website lendgreen.com. Niiwin means "four" in Ojibwe.

75.     Lendgreen is beneficially owned by 4Finance, S.A. ("**4finance**"), a large, worldwide payday loan conglomerate based in Riga, Latvia, which is in turn beneficially owned by Oleg Viktrovich Boyko, a Russian national with ties to the former KGB and whom *Forbes* magazine states is the 75th wealthiest Russian alive.

76.     Domain Name Registration records indicate the ownership of lendgreen.com to be Vivus Servicing, LTD ("**Vivus Servicing**"), in Ontario, Canada. Vivus Servicing is a wholly owned subsidiary of 4finance.

77.     The "rent-a-tribe" model is transparent with respect to Niiwin. Documents authorizing the LDF Tribe to incorporate Niiwin, LLC, as a "tribally owned" limited liability company under the LDF Business Development Corporation were signed on December 17, 2012. An operating agreement between LDF Holdings and Niiwin was signed on July 17, 2013. 4finance, vis-à-vis GMLA Trading Limited, a shell company

based in Malta, provided a $20 million line of credit to Niiwin effective September 26, 2013, and lending operations began immediately thereafter. In return for its investment, 4finance received 95% of revenues and profits; after other expenses were deducted, the LDF Tribe received about 4%.

78.     In sum, despite supposedly owning a multitude of payday loan websites, transacting tens of millions of dollars in total revenues per month – a feat which would require hundreds, if not thousands, of employees in aggregate – each and every payday lending website purportedly owned by the LDF Tribe states its business office to be at the same location: 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538. **SEE PLAINTIFF'S EXHIBIT A.**

### States of Operation Vary Wildly Among Websites "Owned" by LDF Holdings

79.     LDF Holdings prohibits the non-Tribal investors to whom it rents its sovereign immunity from issuing loans in Wisconsin in order to keep the peace with local regulators in its home state.

80.     According to the LDF Tribe's director of business development, this conscious decision "keeps our relationship with the state of Wisconsin healthy." *See* Cary Spivak, *Lac du Flambeau Chippewa enter payday loan business with eye to online gambling*, Milwaukee Journal Sentinel, Dec. 29, 2013, http://archive.jsonline.com/business/lac-du-flambeau-chippewa-enter-payday-loan-business-with-eye-to-online-gambling-b99164952z1-237906421.html.

81.     LDF Holdings also refuses to lend to its own members.

82.     However, individual investors are free to determine the other states in which they choose to operate. Most investors who rent immunity from LDF Holdings opt to not lend in certain states whose attorneys general have taken punitive action against online lenders in the past, such as Virginia, or other states the individual investors may deem too risky. As the result of individual decision-making by dozens of different, independent owners, the exact states where payday loans are offered by LDF Holdings varies considerably from lender to lender. If LDF Holdings actually did own and manage the 50+ websites it claims to own and operate, it would be highly unusual to not have a global policy about doing business in particular states.

83.     For example, **Sky Trail Cash** will not make loans to consumers in Alaska, Arizona, Arkansas, Colorado, Connecticut, Washington, D.C., Georgia, Illinois, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Vermont, Virginia, West Virginia or Wisconsin. **Lendgreen** excludes lending in Arkansas, Connecticut, Georgia, Maryland, New York, Pennsylvania, Virginia, West Virginia, Wisconsin. **Evergreen Loans**, also supposedly owned by LDF Holdings, only prohibits loans in Wisconsin, Virginia, West Virginia, New York, and Arkansas.

84.     The highly inconsistent "excluded states" policies of the different LDF Holdings websites further evidences the fact that these decisions are not made by LDF Holdings but instead are decisions made by each individual website owner.

**LDF Holdings**

85.     LDF Holdings and its subsidiaries are controlled by non-Tribal individuals: its president, operations director, and compliance director are not members of the LDF Tribe.

86.     Neither the LDF Tribe nor LDF Holdings provides the lending capital necessary to support LDF Holdings' payday lending operations or those of its subsidiaries.

87.     Neither the LDF Tribe nor LDF Holdings manages the substantive lending functions of LDF Holdings' payday lending operations or those of its subsidiaries.

88.     Lorenzo, the president of LDF Holdings, previously worked for Triax Management & Dater Portfolio between August 2015 and December 2016 as "**Director Of Sovereign Sales**." She has described her former employer's business model of renting the Tribe's name to non-Tribal entities as follows: "In today's *regulatory environment* it is very important to do business with people that will do things the right way. Triax and Dater have been building very successful businesses over the past 5 years. Our success formula is simple: **Identify Great Tribes, Financiers, Servicers and Best in Class Legal Teams** and have them work cooperatively to build a very profitable compliant business based upon consumer satisfaction." (**Emphasis added**.)

89.     On information and belief, Lorenzo now helps the LDF Tribe and LDF Holdings locate investors who are interested in forming payday loan businesses subject to "rent-a-tribe" agreements.

90.     The frequency with which LDF Holdings creates Tribal LLCs specifically to benefit particular non-Tribal individuals, combined with the fact the president of LDF

Holdings is a non-Tribal member apparently hired for her expertise in crafting "rent-a-tribe" agreements, heavily suggests that LDF Holdings is simply a rental agency for sovereign immunity rather than a lender.

### Infinity and Payday Loan Manager

91.     Infinity is a "back end" services vendor that provides software to analyze, underwrite, service, and collect payday loans. Its website homepage prominently features screenshots of sample payday lending software, with a stock photo of a middle-aged couple smiling near the banner headline of "$500 Cash Loan." **SEE PLAINTIFF'S EXHIBIT E.**

92.     Infinity states that its software "can support your vision… and your success. We have built the industry's best solution for Payday loan management. Our Business Rules Engine will meet your exact lending model and grow along with you. Schedule ACH transactions and reminder messages for automatic payment processes. Follow-up reminders will keep your CSR's on-task when working customer accounts. Refinancing a loan is as easy as clicking a button. Infinity is built to manage your Payday loan product no matter where you are lending." *See infinityels.com.*

93.     Domain registration records show InfinityELS.com is registered to Chris Leyva, 910 Roberta Lane, Sparks, NV 89431, email general@paydayloanmanager.com. **SEE PLAINTIFF'S EXHIBIT F.**

94.     Payday Loan Manager is software for operating a payday lending website, including "an integrated ACH provider that automatically handles the crediting and debiting of your loans." **SEE PLAINTIFF'S EXHIBIT G.**

95.     Infinity's website, infinityELS.com, as well as paydayloanmanager.com, are hosted on servers owned or managed by Infinity, with an IP address of 169.55.60.156. **SEE PLAINTIFF'S EXHIBIT H.**

96.     Cashaisle.net is also hosted on Infinity's server. *Id.*

97.     The IP address for cashaisle.net – 169.55.60.156 – corresponds to a physical location in Kansas, outside of Wichita. Cashaisle.net is essentially the same website as Cashaisle.com, and features the same clip-art logo of a dollar-sign with a shopping cart full of money giving a "thumbs up" sign.

98.     Thus, not only does Infinity provide the "brains" behind Cash Aisle's illegal payday loans – providing and managing the software which underwrites and collects loans, including the loans made to Ms. Beckford – the software which initiated the ACH transactions to and from Ms. Beckford's checking account was stored and ran on servers belonging to Infinity. Infinity's software and infrastructure is, essentially, the engine driving the Defendants' illegal loansharking racket.

99.     Leyva and Infinity received a portion of the profits made off the astronomically high, illegal interest rates charged to Ms. Beckford. Leyva and Infinity were well aware that their software was facilitating loansharking, and that by hosting cashaisle.net on its web server, usurious, illegal loans were being made to Florida residents such as Ms. Beckford. Leyva and Infinity colluded with Bartlett, Dean Financial, and Preferred Call Services, who in turn colluded with LDF Holdings and its Niibin subsidiary, to make and service illegal loans in Florida.

### Multiple Different "Tribally" Owned Payday Websites Hosted on Same Server

100.    More than 100 different payday lending websites are hosted by Infinity on the same server, IP address 169.55.60.156, including AAACommunityFinance.net, another payday lender owned by Bartlett. Many of the lenders claim sham "tribal" affiliations.

101.    One such lender is 605lending.com, a "tribal" payday lender which makes loans at over 700% interest rates, supposedly owned by the Flandreau Santee Sioux Tribe in South Dakota.

102.    Another online payday lending website hosted by Infinity on the same server is Bison Green Loans, which makes loans at over 700% annual interest. Bison Green claims to be owned by WLCC Lending BGL, which is in turned owned by the Wakpamni Lake Community Corporation, purportedly owned by the Oglala Sioux Tribe in South Dakota. Bison Green is actually owned by Aaron Wallis Bishop, through his company ExtraFunds Capital, LLC, in Logan, Utah.

### Preferred Call Services Operates Call Center for Cash Aisle

103.    The main phone number for Cash Aisle is 844-359-6000; this is the only contact or customer service number displayed on CashAisle.com.

104.     When a customer calls this number, they are greeted with an automated message stating they have reached the "internet loan processing department."

105.    Calling 844-359-6000 on September 4, 2020, and waiting for an agent to answer resulted in the agent quickly confirming the caller had, indeed, reached Preferred Call Services.

**CashAisle.com and AAACommunityFinance.com On Same Server**

106.   The IP address for CashAisle.com was, as of September 6, 2020, 66.206.22.54, which corresponds to a physical location in **Tampa, Florida** – over 1,500 miles from the LDF Tribe's reservation in Wisconsin. The server was located at 8010 Woodland Center Blvd., Suite 700, Tampa, FL 33614 and is hosted by NOC4Hosts Inc., which markets itself under the name Hivelocity.

107.   As of September 6, 2020, the IP address for the Bartlett-owned AAA Community Finance, www.AAACommunityFinance.com, was 66.206.22.55, which also corresponds to a physical location in Tampa, Florida, and is hosted by NOC4Hosts, Inc., at the same Tampa data center.

108.   Large data centers like those run by Hivelocity utilize giant racks of servers; an identical IP address other than an increase of 1 in the very last digit, as is the case for Cash Aisle and AAA Community Finance, almost always indicates two servers physically next to each other in the data center.

109.   The odds of any two random websites being hosted from IP addresses one digit off from each other and resolving to servers physically next to each other is less than 1:1,700,000,000.

110.   As of 2019, there were roughly 1.7 billion unique internet domain names. Each domain name has a unique IP address. To make the internet easier to navigate, the **Internet Corporation for Assigned Names and Numbers** ("**ICANN**") administrates a system of domain name servers which act as "phone books" and allow web browsers to quickly translate domain names entered by humans into machine-readable IP addresses.

For example, entering www.disney.com into a web browser results in it quickly querying Disney.com's name server, dens02.dig.com, which informs the web user's browser to connect to 23.221.223.96 – the IP addresses actually hosting Disney.com.

111.    Since name servers are analogous to phone books, most commercially used name servers contain hundreds of thousands of IP addresses, if not more. The name server for both AAACommunityFinance.com and CashAisle.com is NS1.PreferredCallCenter.com, which contains exactly <u>seven</u> IP addresses. Every domain on this name server directly relates to a Bartlett enterprise, including UnifiedMtg.com, the domain for the Bartlett-owned Unified Mortgage LLC in Lucie, Florida.

112.    The fax number listed for Unified Mortgage LLC on its website is (618) 377-9386; the fax number for AAA Community Finance is also (618) 377-9386.

113.    Upon information and belief, AAA Community Finance and Preferred Call Services operate a combined, joint call center operation and share a common office, employees and equipment. AAA Community Finance is a trade name or "doing business as" name registered to Bartlett's company, Dean Financial. **SEE PLAINTIFF'S EXHIBIT I.**

### LDF Holdings Appoints Dean Financial as 'Agent' or 'Service Provider'

114.    To successfully operate Cash Aisle, Dean Financial and Preferred Call Services access detailed consumer data maintained within the files of a number of CRAs which specialize in servicing the needs of the online payday loan industry, including Clarity, FactorTrust, Inc. ("**FactorTrust**"), and ChexSystems, Inc. ("**ChexSystems**").

115.    Without access to the hundreds of datapoints maintained by these CRAs on each consumer – everything from employment, salary information, IP addresses utilized, credit card balances, checking account overdrafts, real estate values, frequency of changes of addresses, and much more – the detailed, computerized underwriting analytics utilized by Dean Financial and Preferred Call Services, *vis-à-vis* Infinity, would be virtually impossible to perform.

116.    Before being allowed to obtain reports from Clarity, the CRAs required Cash Aisle to establish subscriber accounts. Pursuant to the FCRA, the CRAs were required to make reasonable efforts to verify the identity of new subscribers and ensure their reasons for reviewing consumer credit reports were legitimate.

117.    The FCRA's "know your customer" requirements create a potential pitfall for Clarity, as the majority of reports it sells are to online payday lenders. In recent years, a great number of these online payday lenders have adopted a "rent-a-tribe" model. Since a "rent-a-tribe" model inherently means the purported *tribal lending entities* ("**TLEs**") have no involvement in the underwriting of consumer loans, they are not the true end users of the reports and would have no conceivable use for the reports nor any legitimate permissible purpose to obtain the reports under the FCRA.

118.    This creates a Catch-22 for Clarity: if it complies with the FCRA and legitimately verifies the end users of its reports, it will have to refuse service to much of its customer base as having no valid purpose to access consumer credit files. Alternately, if it sells reports to unverified end users, its customer base remains intact, but Clarity is left

exposed to federal regulatory action and private litigation because the alleged lenders are not the ones making the inquiries.

119.    To resolve this issue, Clarity devised a solution in which it allows "tribal" lenders such as Cash Aisle to appoint entities like Dean Financial and Preferred Call Services as "authorized service providers."

## Clarity Fails to Verify Identity of Niibin d/b/a Cash Aisle

120.    Clarity's reports typically include phone numbers, detailed address history, employment information, credit card balances and account numbers, mortgage or rental history, and other highly personal, sensitive information.

121.    When Dean Financial and Preferred Call Services requests credit reports from Clarity, the request will appear to be on behalf of Cash Aisle, or listed as "Cash Aisle" or, in some cases, "Niibin LLC." In any case, the associated address and phone number associated with the inquiry is 572 Peace Pipe Rd., Lac du Flambeau, WI 54538, *No phone number available*. **SEE PLAINTIFF'S EXHIBIT M.**

122.    Prior to providing reports to Dean Financial, Preferred Call Services, and/or Niibin, Clarity was required by the FCRA to "make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report." *See* 15 U.S.C. § 1681e(a).

123.    The FCRA does not define the phrases "reasonable efforts" or "reasonable procedures," but the FTC interprets them to require an agency "to verify that [each user] is . . . **a legitimate business** having a 'permissible purpose' for the information reported." *Aleksic v. Clarity Servs., Inc.*, Case No: 1:13-cv-07802 (N.D. Ill. Jul. 8, 2015), quoting

*Commentary on the Fair Credit Reporting Act*, § 607(b)(2)(A), 55 Fed. Reg. 18,804-01 at

18,819 (May 4, 1990).  (**Emphasis added.**)

124.    In addition, the FCRA imposes a duty of reasonable care on a CRA. *See*

*Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982).

125.    Further, "[n]o consumer reporting agency may furnish a consumer report to

any person if it has reasonable grounds for believing that the consumer report will not be

used for a purpose listed in § 1681b of this title." 15 U.S.C. § 1681e(a).

126.    Clarity failed to make a reasonable effort to verify the identities of Niibin

d/b/a Cash Aisle as required by the FCRA, 15 U.S.C. § 1681e(a). To the contrary, Clarity

made efforts to make it *appear* it had verified the identity of Niibin and verified that Niibin

was a legitimate business, while taking great pains to make sure it did not actually do so.

### How Clarity Verifies *Faux*-Tribal Entities Like Niibin, LLC

127.    When verifying the identity of a supposedly tribally owned payday lender,

Clarity performs extensive due diligence on the ***agent*** but virtually none on the actual tribal

entity. Clarity sends an independent inspector to investigate, document, and photograph

the agent's place of business, and to verify that it has security measures in place to protect

stored data, that the business is staffed by a sufficient number of employees relevant to the

number of reports the business requests, that it has landline office phones, that it has paper

shredders to properly dispose of printed credit reports, and much more.

128.    In contrast, Clarity makes virtually no attempt to verify the identity of the

"tribal" lending entity itself, even though, in all cases, the TLE is the purported end user of

the reports. Instead, Clarity relies upon its verification of the TLE's agent/authorized

service provider. Clarity's review of the end user is limited to reviewing its website online and confirming that the website is functional. By this logic, Clarity would confirm www.Experianne.com as verified and legitimate simply because the website is functional.[1]

129.    Clarity makes no evaluation of the content of the website or that the website is actually operated by the end user. Indeed, Clarity's investigation of the agent/authorized service provider virtually always establishes that the website is operated by the agent/authorized service provider itself.

130.    The end result of Clarity's charade is a 20-page-long inspection report which appears to extensively document the *agent's* business. Thus, Clarity has pre-fabricated plausible deniability sitting at-the-ready, as the "due diligence" inspection reports likely go in to far greater detail than is actually required by the FCRA, whose plain language at § 1681e(a) simply requires "reasonable" investigation.

131.    Having verified the agent, Clarity then shifts the burden of compliance and investigation regarding the end user on to the already-verified agent. Clarity requires agreements to be signed stating that the agent will only obtain reports on behalf of the "tribal" entity and strictly follow FCRA requirements regarding permissible purpose. Thus, Clarity verifies the agent, and the agent, in essence, vouches for the legitimacy of the tribal entity. Clarity's independent investigators are tasked only with verifying that the website of the payday lender exists and functions, but rarely, if ever, makes any kind of on-site inspection of the purported "end user" of its reports.

---

[1] Experianne.com is a parody website of Clarity's parent company, Experian, created by the British comedian John Oliver to draw attention to the wanton disregard of consumer protection statutes by the major CRAs. The parody website Experianne claims the company "specializes in whispering passages from 'Mein Kampf' into the ears of babies, without the permission of parents or the babies themselves."

132.    This formula creates a "win/win" scenario. Clarity can demonstrate that it performed extensive due diligence without harming its customer base. The "agents," such as Dean Financial and Preferred Call Services  – who are almost always the true end users of the reports – can continue to access the data in Clarity's files which provides the high-octane fuel for their underwriting engines. Upon inquiry, agents like Dean Financial and Preferred Call Services claim they are simply technology consultants who streamline the acquisition of data from the CRAs but do not use it themselves. The tribal entities, if pressed, assert sovereign immunity from liability.

133.    Clarity knows that its due diligence investigations have more to do with creating the *appearance* of compliance with the FCRA than actual compliance. Clarity willfully turns a blind eye to the obvious fact that the "agents" are really the end users, and that the multiple-page documents signed by all parties are essentially pre-written alibis.

134.    The instant matter is a prime example. Clarity's own records show it has verified that Niibin LLC d/b/a Cash Aisle has offices located at 572 Peace Pipe Rd., Lac du Flambeau, WI 54538. This appears to be a conflation of the Post Office Box number used by Niibin – P.O. Box 572 – with 597 Peace Pipe Road, the street address of the LDF Smoke Shop. The address of 572 Peace Pipe Road is a small residential apartment and not a commercial address.

135.    The fact that Clarity "verified" Niibin's identity despite glaringly obvious flaws – like its address being reported as a non-commercial, run-down apartment, coupled with the fact that it apparently could not obtain so much as a phone number for the "lender"

– heavily suggests Clarity made **no** attempt to verify the identity of the purported end user of the reports, much less a reasonable one.

136.   Any legitimate "due diligence" inspection of Niibin's physical location would certainly have resulted in a negative recommendation by an inspector. As common sense dictates, a supposed multi-million-dollar lending business operating from a run-down one-bedroom apartment would be enough for even the most unskilled of investigator to conclude that a business could not be verified as legitimate. Any further look past this large crack in the façade would reveal that while Niibin claims to be owned and governed by LDF Holdings, the tribe has more than four dozen different lending businesses, each one purchasing reports from Clarity, and each one with a different "agent" or "service provider."

137.   Any legitimate due diligence inspection of Niibin (or any other LDF-affiliated lender) would find these facts to be of significant concern as a "50-different-lenders-with-50-different-agents" model practically telegraphs fraud. There would be no economy-of-scale or efficiency for a real lending conglomerate, like LDF Holdings claims to be, to have 50 different agents managing 50 different lending businesses, with each agent/service provider having a different office. Indeed, this would practically be a "how-to" guide in redundancy, duplication, and inefficiency. The only conceivable reason LDF Holdings would appoint a different agent/service provider for each iteration of its payday lending companies was if the tail was wagging the dog, and the "service providers" were the beneficial owners, with LDF Holdings simply collecting a commission for providing the purported cloak of sovereign immunity.

138.    Clarity's verification of Niibin LLC d/b/a Cash Aisle consisted entirely of verifying Dean Financial and Preferred Call Services as *bona fide* businesses, and Clarity allowed Dean Financial and Preferred Call Services to simply represent that, in turn, they could vouch for Niibin's compliance with the FCRA.

139.    Further disproving any assertion that Niibin is the actual end user of Clarity's reports is the fact that Dean Financial and Preferred Call Services pay the invoices from Clarity each month for all reports purportedly sold to Cash Aisle. Additionally, tradeline data – *e.g.*, consumer payment data on loans made by Cash Aisle – is reported to Clarity by Dean Financial and Preferred Call Services, or entities under the direct control and ownership of Dean Financial and Preferred Call Services.

## CRA Inquiries Show Bethalto, IL Address For 'Tribally Owned' Cash Aisle

140.    Bartlett's AAA Community Finance is also a storefront payday lender in Bethalto, Illinois. Its address is 117 S. Prairie St., Bethalto, IL 62010 and its phone number is (618) 377-6700. **SEE PLAINTIFF'S EXHIBIT J.**

141.    When the "tribally" owned Niibin obtains credit reports from FactorTrust, a CRA that caters to the short-term lending industry, FactorTrust obtains supplemental information from Trans Union, one of the Big Three nationwide CRAs.

142.    "Niibin, d/b/a Cash Aisle," was assigned customer number 3876 by FactorTrust. When acquiring supplemental information from Trans Union, the customer number 4027 is utilized by "Niibin, d/b/a Cash Aisle."

143.     Inquiries logged by Trans Union show information obtained by "CUSTOMER 4027 via FTNIIBIN LLC DBA CASH AI" with an address of 117 S. Prairie St., Bethalto, IL 62010, phone (618) 377-6700. **SEE PLAINTIFF'S EXHIBIT K.**

144.     Due to idiosyncrasies in Trans Union's systems that produce consumer disclosures, inquiries originating from FactorTrust, but from which information is pulled from the consumer's Trans Union history, appear with the prefix "FT" appended. For example, "FTNIIBIN LLC DBA CASH AI." means Niibin, LLC, doing business as Cash Aisle, obtained via FactorTrust. Due to systemic technical issues on Trans Union's end, Trans Union's consumer disclosures often inadvertently disclose the *real* lender's address and phone number, rather than the "tribal" address and phone number which is supposed to appear on the disclosure.

145.     Thus, pursuant to Trans Union's records, a Bartlett-owned business in Bethalto, IL is the entity actually obtaining, and using, credit reports obtained from Trans Union.

### Bartlett, et al., with Consent of Niibin and LDF Holdings, Obtain Credit Reports Illegally

146.     On April 29, 2019, Bartlett, Dean Financial, and Preferred Call Services requested and obtained *Credit Bureau Reports* ("**CBRs**") from FactorTrust, Trans Union, Clarity, and Experian concerning Ms. Beckford.

147.     FactorTrust made a record of the inquiry and disclosed it to Ms. Beckford as having been made by "Cash Aisle, PO Box 572, Lac Du Flambeau, WI 54538, customers@cashaisle.com." **SEE PLAINTIFF'S EXHIBIT L.**

148.    Taken at face value, it would appear as if the inquiry was made by Niibin/LDF Holdings, as the address disclosed is a post office box on tribal lands. In reality, the inquiry was made by Bartlett, Dean Financial, and Preferred Call Services in Florida, not Niibin/LDF Holdings in Wisconsin.

149.    Clarity also made a record of the inquiry. Clarity then obtained supplemental information from Experian Information Solutions, Inc. ("**Experian**"), another one of the Big Three nationwide CRAs. A record of the inquiry was recorded by Experian as "Clarity/Cash Aisle, 572 Peace Pipe Rd., Lac du Flambeau, WI 54538, *No phone number available*." **SEE PLAINTIFF'S EXHIBIT M.**

150.    Clarity had no reason to believe that Niibin, who purports to operate from a one-bedroom apartment at 572 Peace Pipe Rd., was the actual end user of the report, as claimed, and that the report would be used by no other parties, and that the request for Ms. Beckford's CBR was legitimately in response to action in which she engaged.

151.    To facilitate the charade, Niibin and LDF Holdings certified to Clarity, FactorTrust, Trans Union and Experian – and, almost certainly, other CRAs as well – that Dean Financial, Preferred Call Services and Bartlett were authorized "service providers" for Niibin/LDF Holdings and were thus authorized to obtain credit reports on behalf of Niibin/LDF Holdings, and Niibin/LDF Holdings were the true end users of the reports.

152.    Further, Niibin and LDF Holdings also previously signed and submitted blanket certifications of permissible purpose to FactorTrust, Clarity, Experian and Trans Union, falsely declaring that Niibin and LDF Holdings (via their "service providers," Dean Financial, Preferred Call Services and Bartlett) needed reports to evaluate consumers for

loans for which they *already applied*. Niibin and LDF Holdings knew that in many, if not

all, instances, credit reports would be obtained prior to any potential permissible purpose

existing, since only a small fraction of Cash Aisle's web traffic comes organically. The

lion's share of Cash Aisle's customers only become aware of Cash Aisle after direct

solicitation by Cash Aisle – solicitations only made to consumers who fit Cash Aisle's

underwriting criteria, as ascertained by sophisticated analysis of the detailed credit reports

provided by CRAs such as FactorTrust and Clarity.

153.    Niibin and LDF Holdings provided such sham declarations and

certifications to FactorTrust, Clarity, Experian and Trans Union as part of their duties under

the "rent-a-tribe" deal reached with Bartlett, Dean Financial, and Preferred Call Services.

154.    When agreeing to such a scheme, Niibin and LDF Holdings knew that

reports on tens of thousands of consumers would be obtained in Niibin's name and would

show as having been obtained by Niibin on consumer disclosures provided by the CRAs,

thus keeping consumers in the dark as to who had actually obtained their credit reports,

skirting the disclosure requirements of the FCRA.

155.    Indeed, part of the fees received by Niibin/LDF Holdings pursuant to the

"rent-a-tribe" scheme is to compensate Niibin/LDF Holdings for signing paperwork

declaring to the CRAs that they are the "end users" of reports which are actually pulled

and used by Bartlett, Dean Financial, and Preferred Call Services, doing business as Cash

Aisle.

156.    Despite the combined efforts of Niibin, LDF Holdings, Bartlett, Dean

Financial, and Preferred Call Services to make it appear otherwise, Bartlett, Dean

Financial, and Preferred Call Services are not mere administrative assistants fetching reports for their bosses, Niibin and LDF Holdings. To the contrary, Bartlett and his companies *are* the bosses.

157.    Concurrent to the FactorTrust inquiry, Bartlett, Dean Financial, and Preferred Call Services requested a supplemental report on Ms. Beckford from Trans Union. **SEE PLAINTIFF'S EXHIBIT K.**

158.    Bartlett, Dean Financial, and Preferred Call Services provided the reams of data harvested from the FactorTrust, Clarity, Experian and Trans Union reports to Infinity and Leyva. Infinity and Leyva then input that data into sophisticated underwriting algorithms to determine if Ms. Beckford would be a suitable candidate for a Cash Aisle loan.

159.    The underwriting engines designed by Infinity and Leyva are of virtually no use unless fueled by the hundreds of datapoints provided by the credit reports obtained by Bartlett, Dean Financial, and Preferred Call Services, who had, in turn, acquired the data from the CRAs for their own use.

160.    When Infinity and Leyva crunched the data fed to it by Bartlett and his companies – information derived only from reports impermissibly obtained by Bartlett, Dean Financial, and Preferred Call Services – they thus became users of the reports.

161.    At no point was it disclosed to FactorTrust, Clarity, Experian or Trans Union that Infinity and Leyva would be users of the reports. To the contrary, Bartlett, Dean Financial, and Preferred Call Services certified to these CRAs that, as service providers for

Niibin and LDF Holdings, they were simply obtaining the reports for Niibin LLC, d/b/a Cash Aisle, who would be the **sole** end user of the report.

162.    No contract or agreement for services between Niibin/LDF Holdings and Infinity exists. A contract for services between Bartlett/Dean Financial/Preferred Call Services and Infinity/Leyva *does* exist.

163.    As authorized service providers, invoices for the reports purportedly obtained by Niibin/LDF Holdings could be sent directly to Bartlett/Dean Financial/Preferred Call Services. Bartlett/Dean Financial/Preferred Call Services paid these invoices from their own funds and were not reimbursed by Niibin/LDF Holdings.

164.    Despite claiming to be the end user of the reports, Niibin did not pay for the reports because Niibin had zero use for them and did not actually want, need or request the reports. Niibin and LDF Holdings had no say in the underwriting process performed by Infinity and Leyva. Rather, Niibin and LDF Holdings simply agreed to a scenario wherein they electronically rubber-stamped report requests, making it appear as though they were the end users.

165.    Pursuant to the FCRA, 15 U.S.C. § 1681b(f), any person requesting a CBR must have a *permissible purpose* for obtaining it.

166.    Bartlett, Dean Financial, and Preferred Call Services, pretending to be simple forwarding agents for Niibin LLC/Cash Aisle, certified to FactorTrust, Clarity, Experian and Trans Union, that Niibin LLC/Cash Aisle were the end users of the report, and that Dean Financial and Bartlett, as "service providers" for Niibin/LDF Holdings, had

a permissible purpose to obtain the report because Ms. Beckford had ***already initiated*** a request for credit or some other business transaction directly with Cash Aisle.

167.    This certification was false for multiple reasons. First, Niibin/LDF Holdings were not the "end users" of the reports; Dean Financial and Preferred Call Services were. Second, at the time of the credit inquiry, Ms. Beckford had not applied for a loan with Niibin, Cash Aisle, or any entity related to Bartlett, Preferred Call Services, Dean Financial or LDF Holdings. At the time the inquiry was made, Ms. Beckford had not consented to a credit report being obtained regarding her by Niibin, Cash Aisle or any related entity.

168.    Beyond this, even assuming, *arguendo*, that Ms. Beckford had applied for a loan with Cash Aisle prior to the time of the inquiry, there was still no permissible purpose pursuant to the FCRA for Bartlett, Dean Financial, Preferred Call Services, AAA Community Finance, Niibin, or LDF Holdings to obtain a CBR regarding her, since the only loan Ms. Beckford could possibly have been evaluated for was usurious in Florida and thus *void ab initio*. As such, no "credit transaction" could have even potentially occurred.

169.    Dean Financial and Preferred Call Services, as purported service providers for Niibin/Cash Aisle, obtained Ms. Beckford's CBR after they purchased her basic personal information – *e.g.,* name, address, date of birth, employer, banking information, etc. – from LendYou.com, an online payday loan lead generator. The purpose of the CBR was to get more-detailed information about Ms. Beckford to determine if, and how, it should market Cash Aisle loans to her.

170.    LendYou.com is a website that advertises how quick and hassle-free it is to obtain a loan with their network of lenders. The website claims that its affiliated lenders make personal loans at annual interest rates between 4.99% and 450% annually, which vary by lender. However, LendYou.com sells the consumer data it harvests to many lenders who make loans at over 700% annual interest like Cash Aisle.

171.    LendYou.com then re-sells information about consumers like Ms. Beckford to illegally operating payday lenders like Cash Aisle, which then seeks to qualify its "leads" by obtaining highly detailed credit reports containing the consumer's spending and financial behavior from sources like Clarity.

172.    Once the leads are purchased from a lead generator such as LendYou.com online payday lenders like Cash Aisle use sophisticated predictive algorithms to determine which consumers may be financially distressed but retain the ability and willingness to make loan payments. In the instant matter, Infinity used the Clarity CBR information and ran it through its payday loan underwriting engines on behalf of Dean Financial and Preferred Call Services, doing business as Cash Aisle.

173.    Once identified, qualified consumers like Ms. Beckford are bombarded with a flood of advertising emails, text messages, automated sales phone calls, and more, playing up the "quick and easy" loan terms offered, with no mention of the true cost of the loan.

174.    To lure in consumers, almost all lead generator's websites (including LendYou.com) utilize euphemisms and call payday loans a more-benign "unsecured installment loans," "unsecured personal loans," or similar. Almost all lead generators'

websites imply that the lenders they match consumers with are licensed to lend in the consumer's home state, even though entities like Cash Aisle are not. None of the lead generators, including LendYou.com, disclose the strong probability that the consumer will be matched with illegally operating, unlicensed lenders charging rates criminally prohibited by Florida law as well as the law of many other states.

175.    Thus, any consent that loan sharks like Cash Aisle may claim to have obtained *vis-a-vis* a "lead generator" virtually always involves deception and materially false representations. At no point do consumers like Ms. Beckford provide consent for their personal information to be shared with unlicensed loan sharks like Cash Aisle. Further, the consent obtained by lead generators is highly limited in nature and subject to revocation. For example, the terms and conditions of LendYou.com states, in part:

> *This service does not constitute an offer or solicitation for loan products which are prohibited by any state law. (…) This service and offer are void where prohibited.* (…) *Repayment terms may be regulated by state and local laws.*

176.    Loans from "lenders" like Cash Aisle are strictly prohibited by Florida law. Additionally, Florida law expressly prohibits the marketing and soliciting of illegal loans and thus, pursuant to LendYou.com's own terms and conditions, its offer to match Ms. Beckford to a lender is ***void*** when the lender is an unlicensed, illegally operating loan shark like Cash Aisle and the consumer resides in a state which prohibits usury, like Florida.

177.    Because LendYou.com's offer to match Ms. Beckford with a lender was void, any consent that Ms. Beckford may have provided to allow LendYou.com to forward her information to Cash Aisle and have Cash Aisle obtain a credit report was likewise void.

A consumer like Ms. Beckford cannot "consent" to an agreement to have her personal information shared with an illegally operating usurious lender when the contract creating such consent clearly states that the offer is void where prohibited, and Ms. Beckford lives in a state which expressly prohibits usurious lending.

178.    Many lead generators virtually identical to LendYou.com have been subject to state and federal regulatory action for selling leads to lenders they knew were operating illegally. One such online payday loan lead generator was Zero Parallel, LLC ("**Zero Parallel**"). Zero Parallel, along with its owner, Davit Gasparyan, agreed to pay $350,000 in fines to the *Consumer Financial Protection Bureau* ("**CFPB**") in 2017; the CFPB alleged that Zero Parallel duped consumers into providing personal information about themselves and then knowingly re-sold these leads to online payday lenders that were operating illegally.

179.    As the result of the Cash Aisle's misleading marketing, Ms. Beckford became a Cash Aisle customer and took out a loan which was subject to a 700% annual interest rate.

### Cash Aisle Makes Illegal Loans in Florida and Collects from Ms. Beckford

180.    On or around May 1, 2019, Ms. Beckford obtained a loan from the Defendants, through Cash Aisle, at an annual interest rate of 788%.

181.    The Defendants wired the loan proceeds to Ms. Beckford's checking account in Lakeland, Florida.

182.    On or about May 11, 2019, the Defendants, through Cash Aisle, began initiating ACH debits of $141 from Ms. Beckford's checking account.

183.    The Defendants' attempts to withdraw funds from Ms. Beckford's bank account caused her to incur **overdraft fees** of at least $100.

184.    In late May and June 2019, the Defendants emailed Ms. Beckford, attempting to collect the purported remaining, unpaid balance of $791.

185.    The Defendants made other collection attempts by phone and text message.

186.    The Defendants' loan vastly exceeded the maximum lawful interest rate in Florida and is thus an *unlawful debt* as defined under the CRCPA, Section 772.102(2)(a)(3).

187.    As the making and collection of the loan constituted a felony in Florida, pursuant to Section 687.071, Florida Statutes, the Defendants engaged in criminal actions against Ms. Beckford.

188.    Assuming, *arguendo*, that the Defendants raised a sovereign immunity defense to the criminal prosecution of these offenses, sovereign immunity does not turn an otherwise illegal loan into a legal one. At best, it potentially creates a defense to the criminal or civil prosecution of the LDF Tribe – and only the LDF Tribe – for the crime. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019).

189.    Beyond this, it is well established that an *individual* member of a tribe is not entitled to that tribe's immunity when sued in their individual capacity. *See Lewis v. Clarke*, 137 S. Ct. 1285 (2017) ("We hold that, in a suit brought against a tribal employee in his individual capacity, the employee, not the tribe, is the real party in interest and the tribe's sovereign immunity is not implicated"); *see also Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 171-72 (1977) (holding that the "doctrine of sovereign immunity . . . does not

immunize individual members of [a] Tribe"); *Missouri v. Webb*, No. 4:11CV1237 AGF at *8 ("Webb, as an enrolled member of the Tribe, is not individually entitled to immunity…") The Supreme Court in *Lewis v. Clarke* further held "that an employee…acting within the scope of his employment at the time the tort was committed is not, on its own, sufficient to bar a suit against that employee on the basis of tribal sovereign immunity." *Lewis v. Clarke*, 137 S. Ct. 1285.

**Illegal Loans Took Place in Florida; Subject to Florida Law**

190.    The online payday loans issued by Cash Aisle do not actually occur on an Indian reservation, regardless of whether certain administrative aspects are addressed on the LDF Tribe's land.

191.    As aforementioned, the physical location of Cash Aisle's web server is in Kansas, and the server is owned and managed by Infinity. Infinity also owns the software powering Cash Aisle's loan decisions.

192.    A significant majority of the transaction occurs within the State of Florida – from completing the application to receiving the funds.

193.    Ms. Beckford, like most customers of Cash Aisle, acquired her loan without leaving her home. The loan proceeds were deposited into her bank account in Lakeland, Florida.

194.    Recently, federal appellate courts have held that where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons'

act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

195.    Ms. Beckford has never set foot on LDF tribal land in Wisconsin.

196.    Other than providing a sham "physical office" in Lac du Flambeau, Wisconsin, and providing signatures of Tribal officials on any required paperwork, the LDF Tribe contributes virtually nothing to the operation of Cash Aisle. The overwhelming bulk of the profits goes to Bartlett and his companies, which reflects this heavily unbalanced workload.

197.    Thus, as the loan was requested and obtained in Florida, the proceeds of the loan were wired to a Florida bank, payments were debited from a Florida bank, and collection emails and phone calls were made to Ms. Beckford at her home in Florida, for all reasonable intents and purposes, the loan occurred in Florida and is governed by the laws of the State of Florida.

## Defendants Have No Legitimate Sovereign Immunity

198.    An entity which functions as an arm of the tribe shares that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010), (*holding* "tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, provided that the relationship between the tribe and the entity *is sufficiently close* to properly permit the entity to share in the tribe's immunity") (emphasis added).

199.    To determine if a particular entity is entitled to immunity, the majority of courts have adopted the framework laid out in *Breakthrough,* at 1187-88, which analyzed:

    a.   [the entities'] method of creation;

    b.   their purpose;

    c.   their structure, ownership, and management, including the amount of control the tribe has over the entities;

    d.   whether the tribe intended for the entities to have tribal sovereign immunity;

    e.   the financial relationship between the tribe and the entities; and,

    f.   whether the purposes of tribal sovereign immunity are served by granting immunity to the entities.

200.    Pursuant to the framework laid out in *Breakthrough*, Cash Aisle, like all of the other 50+ payday loan websites supposedly operating from the second floor of a cigarette store, fails in virtually every aspect.

201.    At all times relevant, Cash Aisle and LDF Holdings employed only a handful of tribal members who worked on the LDF Tribe's lands, while many more non-Tribal employees worked in call centers and offices off tribal lands, managing and operating the business.

**<u>Method of Creation</u>**

202.    With respect to the method of creation and circumstances surrounding it, LDF Holdings did not start its own lending enterprise but rather slapped its name onto a business that was already established by non-Tribal persons.

203.    The repurposing of a pre-existing entity suggests that there is not sovereign immunity. *See Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 272 (E.D. Va. 2018) (stating "the Tribe was not starting an independent lending operation but rather facilitating the absorption of Red Rock's fully-functioning lending enterprise which had a decidedly non-tribal character").

### **Purpose**

204.    With respect to the entity's purpose, a court must decide whether it relates to the "broader goals of tribal self-governance," separate from economic activities, or if "the entity was created solely for business purposes and without any declared objective of promoting the tribe's general tribal or economic development." *Williams*, 329 F. Supp. 3d at 273 (citing "*People ex rel. Owen v. Miami Nation Enters*, 2 Cal. 5th 222, 245 (Cal. 2016)).

205.    Evidence of "the number of jobs [the entity] creates for tribal members or the amount of revenue it generates for the tribe" suggests that it is an arm of the tribe, but "evidence that the entity engages in activities unrelated to its stated goals or that [it] actually **operates to enrich primarily persons outside of the tribe** or only a handful of tribal leaders" shows the opposite. *People ex rel. Owen v. Miami Nation Enters.*, 2 Cal. 5th 222 (Cal. 2016) (**emphasis added**).

206.    While the LDF Tribe has some nominal involvement in LDF Holdings and its related lending companies, only a handful of tribal members are employed in payday lending in general; the real management, control, and financial benefit rests with non-tribal entities and persons.

207.    Less than 3% of lending revenues actually remain in the LDF Tribe's possession, with the remainder going to the myriad non-Tribal beneficial owners and investors.

208.    Thus, the primary purpose that non-Tribal investors such as Bartlett and his companies had in helping LDF Holdings create payday websites like Cash Aisle was to *enrich themselves,* not the LDF Tribe. The few pennies on the dollar received by the LDF Tribe is simply a cost of doing business.

## Structure, Ownership, and Management

209.    The myriad non-Tribal entities which rent the LDF Tribe's sovereign immunity exert near unilateral control over the lending businesses. Even the president of LDF Holdings is a Tampa, Florida, businesswoman who is not a member of the tribe.

210.    Non-Tribal individuals perform the lion's share of the work required to run Cash Aisle, including the underwriting, collection, and servicing of the loans.

211.    When a consumer applies for a loan, software owned by Infinity assigns a "risk score" to the applicant. Infinity, Bartlett and Dean Financial do not reveal to LDF Holdings or Niibin *how* the "risk score" is calculated, nor do they have any reason to do so, since it is not money belonging to LDF Holdings which is actually being lent to borrowers like Ms. Beckford.

212.    LDF Holdings and Niibin have no say in which loans are funded; however, they do receive a small percentage of profits for providing the veneer of sovereign immunity, and thus, they received a portion of the illegal interest paid by Ms. Beckford.

213.    Courts have found these facts to be contrary to the successful assertion of sovereign immunity. *See Williams*, 329 F. Supp. 3d at 279 (finding that a similar non-tribal entity exerted control over a purportedly tribal payday lender by unilaterally determining the criteria for prescreened credit offers).

### Financial Relationship between LDF Tribe and Cash Aisle

214.    As aforementioned, the LDF Tribe receives only a small portion of Cash Aisle's revenues, at most 3%.

215.    Such a small percentage suggest that Cash Aisle is not an "arm of the LDF Tribe" and is thus not entitled to sovereign immunity.

216.    Pursuant to the *Breakthrough* Court's analysis, Cash Aisle does not function as an arm of the tribe, and therefore, it cannot escape the purview of state usury laws under the doctrine of sovereign immunity.

### Lorenzo's Involvement

217.    An *individual* member of a tribe is not entitled to that tribe's immunity when sued in their individual capacity. *See Lewis v. Clarke*, 137 S. Ct. 1285 (2017).

218.    Lorenzo is not a member of the LDF Tribe, nor is she affiliated with the LDF Tribe in any way other than her employment with LDF Holdings.

219.    Lorenzo directly participated in the collection of the unlawful debt by Infinity, Bartlett, Dean Financial, and Preferred Call Services, under the guise that such collection was being facilitated by the LDF Holdings-owned Niibin.

220.     Lorenzo also participated *indirectly* in the collection of the unlawful debts through her role as president of LDF Holdings.

221.     On information and belief, Lorenzo received proceeds derived directly from Cash Aisle's collection of usurious debts, such as Ms. Beckford's.

222.     Ms. Beckford has hired the aforementioned law firm to represent her in this matter, and has assigned her right to fees and costs to such firm.

**COUNT I**
**VIOLATIONS OF THE FCCPA**

223.     Ms. Beckford incorporates paragraphs 1 – 222 as if fully stated herein.

224.     Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services violated **Section 559.72(9), Florida Statutes**, when they asserted the existence of a legal right which does not exist, specifically the right to collect an online payday loan issued at an interest rate of 788% annually, when such loans are null and void and contrary to public policy.

225.     Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services violated **Section 559.72(9), Florida Statutes**, when they asserted a debt was legitimate when it was not, when they emailed and texted Ms. Beckford in May and June 2019, claiming $791 was owed on a loan of $500 – a portion of which had already been repaid – when it was not owed, as the entire loan was null, void, and unenforceable against Ms. Beckford.

226.     Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services made phone calls and sent text messages to Ms. Beckford at

her home in Lakeland, Florida, in connection with the collection of this loan. The Defendants also utilized bank wire transfers to credit, and then debit, Ms. Beckford's checking account that she maintains in Lakeland, Florida.

227.    Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services acted willfully in making a usurious loan to Ms. Beckford and pursuing collection of the loan in Florida. The LDF Tribe and Lorenzo have been sued before for similar conduct and are aware of its illegality, as are Infinity and Leyva. The Defendants' entire business model predicates itself on asserting an affirmative defense to violation of Florida law – purported sovereign immunity. The fact that the Defendants prominently, and affirmatively, assert legal defenses to their actions establishes that they are well aware of the illegality of their lending business.

228.    Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services' conduct renders them jointly and severally liable for the above-stated violations of the FCCPA.

**WHEREFORE,** Ms. Beckford respectfully requests that this Honorable Court enter judgment against Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services, jointly and severally, for:

a.    Statutory damages of **$1,000.00** pursuant to Section 559.77(2), Florida Statutes;

b.    Actual damages of at least **$282**, pursuant to Section 559.77(2), Florida Statutes;

c.      Injunctive relief prohibiting the Defendants from making any further collection attempts which violate Florida law pursuant to Section 559.77(2), Florida Statutes;

d.      Reasonable costs and attorneys' fees pursuant to Section 559.77(2), Florida Statutes; and,

e.      Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE CRCPA

229.    Ms. Beckford incorporates paragraphs 1 – 222 as if fully stated herein.

230.    **Niibin** violated **Sections 772.103(1) and (3), Florida Statutes**, when it, with criminal intent, engaged in a pattern where it made loans well in excess of 45% interest per annum to Florida consumers, including a loan to Ms. Beckford, when such loans are in in violation of Section 687.071(3), Florida Statutes, and then proceeded to collect these unlawful debts and obtain proceeds therefrom, through ACH debits, phone calls and emails to Ms. Beckford at her home in Florida, and then threatening to impair her credit report and scores if she failed to repay the usurious loan. Niibin used the proceeds from unlawful debts in the operation of its ongoing business enterprise.

231.    **LDF Holdings** and **Lorenzo** violated **Sections 772.103(1) and (3), Florida Statutes**, when they, with criminal intent, through their association with Niibin and Bartlett, participated both directly and indirectly in the collection of an unlawful debt, specifically a loan to Ms. Beckford, and received a portion of the proceeds therefrom, which they used in the operation of their ongoing business enterprise.

232.     **Bartlett, Dean Financial** and **Preferred Call Services** violated **Sections 772.103(1) and (3), Florida Statutes**, when they, with criminal intent, through their association with Niibin and LDF Holdings, participated both directly and indirectly in the collection of an unlawful debt, specifically a loan to Ms. Beckford, and received a portion of the proceeds therefrom, which they used in the operation of their ongoing business enterprise.

233.     **Infinity** and **Leyva** violated **Sections 772.103(1) and (3), Florida Statutes**, when they, with criminal intent, through their association with Niibin, LDF Holdings, and Bartlett, participated both directly and indirectly in the collection of an unlawful debt, specifically a loan to Ms. Beckford, and received a portion of the proceeds therefrom, which they used in the operation of their ongoing business enterprise.

234.     Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services violated **Section 772.103(4), Florida Statutes**, when they knowingly conspired to engage in criminal activity, a pattern where they made loans well in excess of 45% interest per annum, in violation of Section 687.071(3), Florida Statutes, and then proceeded to collect these unlawful debts and obtain proceeds therefrom, through ACH debits, phone calls and emails to Ms. Beckford at her home in Florida.

235.     Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services engaged in the collection of unlawful debts and obtained proceeds therefrom, with criminal intent, as all Defendants (other than Clarity) were well aware that the loans at issue are usurious in many states, including Florida. LDF Holdings and Lorenzo, personally, have been sued in the past for such lending. The Defendants'

business model readily acknowledges the illegal nature of the loans and goes to great lengths to obfuscate how, and by whom, the loans are made, in an attempt to deceive consumers into believing that they have no legal recourse against the enforcement of such debts. The Defendants' entire business model predicates itself on asserting an affirmative defense to violation of Florida law – purported sovereign immunity. The fact that the Defendants prominently, and affirmatively, assert legal defenses to their actions establishes that they are well aware of the illegality of their lending business.

236.    Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services' actions were knowingly unlawful, willful, intentional, and done with the express intention of deceiving Ms. Beckford and taking money from her that they had no legal right to take.

237.    Ms. Beckford has been damaged in that she paid an unenforceable loan, and she suffered severe emotional distress in being subjected to false and misleading collection efforts by the Defendants.

238.    Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services are jointly and severally liable for the above-stated violations as part of a common enterprise to carry out the aforementioned violations.

239.    Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services' conduct renders them liable for the above-stated violations of the CRCPA.

**WHEREFORE,** Ms. Beckford respectfully requests that this Honorable Court enter judgment against Niibin, LDF Holdings, Lorenzo, Infinity, Leyva, Bartlett, Dean Financial, and Preferred Call Services, jointly and severally, for:

a.      Threefold the amount of actual damages of at least **$282** (for a total of **$846**), or, in the alternate, the statutory minimum of $200, whichever is greater, pursuant to Section 772.104(1), Florida Statutes.

b.      Reasonable costs and attorneys' fees pursuant to Section 772.104(1), Florida Statutes.

c.      Any other relief this Court deems equitable and proper under the circumstances.

## COUNT III
## VIOLATIONS OF THE FCRA –
### *Preferred Call Services, Dean Financial, LDF Holdings, Niibin*

240.     Ms. Beckford incorporates paragraphs 1 – 222 as if fully stated herein.

241.     Preferred Call Services, and Dean Financial violated **15 U.S.C. § 1681b(f)** when they obtained credit reports regarding Ms. Beckford from FactorTrust, Clarity, Experian and Trans Union without a permissible purpose. Bartlett, Preferred Call Services, and Dean Financial claimed that the permissible purpose stemmed from Ms. Beckford's application for a loan; in reality, they obtained Ms. Beckford's credit reports *before* Ms. Beckford applied for any such loan. *After* obtaining the reports to pre-screen Ms. Beckford, without her knowledge or consent, the Defendants solicited Ms. Beckford to become a customer of Cash Aisle and obtain a loan. Permissible purpose requires consent at the time of the inquiry and cannot be applied retroactively.

242.    Preferred Call Services, Dean Financial, Niibin and LDF Holdings violated **15 U.S.C. § 1681b(f)** when Preferred Call Services and Dean Financial obtained credit reports from FactorTrust, Clarity, Experian and Trans Union under false pretenses, claiming Niibin/Cash Aisle/LDF Holdings were the end users of the report, when in actuality, Preferred Call Services, Dean Financial and Infinity were the true end users of the reports. Preferred Call Services and Dean Financial provided the reports to Infinity to feed into underwriting algorithms developed and maintained by Infinity and Leyva; as the direct result of Preferred Call Services and Dean Financial providing the reports to Infinity, Ms. Beckford was selected as a prime candidate to be targeted with marketing pitches touting the advantages of a quick, hassle-free loan from Cash Aisle, albeit at the cost of paying more than 700% interest for such convenience.

243.    Niibin and LDF Holdings violated **15 U.S.C. § 1681b(f)** when they certified to FactorTrust, Clarity, Experian and Trans Union that they were the end users of reports obtained by their "service providers," Preferred Call Services and Dean Financial, and that, pursuant to the FCRA, they would ensure that no one else used the reports, and that the reports would only be used for purposes allowable under the FCRA.

244.    Niibin and LDF Holdings knew such certifications were false and that they would *not* be using the reports in any meaningful way. Niibin and LDF Holdings made such certifications to provide cover to Preferred Call Services and Dean Financial, allowing them access to the trove of millions of consumer credit reports maintained by such CRAs. As a typical Cash Aisle loan results in roughly $2,000 of profit, Niibin/LDF Holdings stood to make $40 to $60 for each loan approved and collected – a process whose origin begins

with the harvesting of credit data from FactorTrust, Clarity, Experian and Trans Union. Niibin and LDF Holdings know reports will be obtained in their name without permissible purpose, but their desire for profit trumps their desire for the protection of consumer's private financial information.

245.   Preferred Call Services, Dean Financial, Niibin and LDF Holdings are jointly and severally liable for the above-stated violations as part of a common enterprise to carry out the aforementioned violations.

246.   As a result of their conduct, Preferred Call Services, Dean Financial, Niibin and LDF Holdings are liable to Ms. Beckford pursuant to the FCRA for statutory damages of $1,000 for each occurrence, and other relief.

**WHEREFORE,** Ms. Beckford respectfully requests this Court to enter judgment against Preferred Call Services, Dean Financial, Niibin and LDF Holdings, jointly and severally, for:

a.   The greater of statutory damages of **$1,000.00** per incident (for a total of **$4,000**) pursuant to 15 U.S.C. § 1681n(a)(1)(B) or Ms. Beckford's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

c.   Such other relief that this Court deems just and proper.

## COUNT IV
## VIOLATIONS OF THE FCRA – *Clarity*

247.    Ms. Beckford incorporates Paragraphs 1 – 222 as if fully stated herein.

248.    Clarity violated **15 U.S.C. §1681e(a)** when it failed to make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report by accepting, without challenge or independent verification, the identity of "Niibin LLC d/b/a Cash Aisle." Niibin claimed to operate from a one-bedroom apartment in Wisconsin and Clarity – according to its own records – had no phone number available to contact Niibin. Clarity helped engineer a verification system where non-tribal proxies were vetted as purported agents, intentionally overlooking the fact that these agents had virtually no incentive to tell the truth. No *reasonable* verification of the identity of Niibin d/b/a Cash Aisle could have occurred by Clarity, and any reasonable verification would have quickly revealed that the proclaimed tribal owner of Cash Aisle was not the real end users of the reports.

249.    Clarity violated **15 U.S.C. § 1681b(a)** when it provided a report to Niibin d/b/a Cash Aisle, when it had no reason to believe that Niibin had legitimate permissible purpose to obtain credit reports.

250.    Clarity's conduct was willful and intentional, or alternately, was done with a reckless disregard for its duties under the FCRA.

251.    As a result of its conduct, Clarity is liable to Ms. Beckford pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. Beckford respectfully requests this Honorable Court enter judgment against Clarity, and for her, for:

(a) The greater of statutory damages of **$1,000** per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Beckford's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. §1681n(a)(1)(A) or 15 U.S.C. §1681o(a)(1);

(b) Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

(c) Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

(d) Such other relief that this Court deems just and proper

## COUNT V
## VIOLATIONS OF THE FCRA – *Infinity*

252. Ms. Beckford incorporates Paragraphs 1 – 222 as if fully stated herein.

253. Infinity violated **15 U.S.C. § 1681b(f)** when it used reports obtained from FactorTrust, Clarity, Experian and Trans Union regarding Ms. Beckford without a permissible purpose, as Infinity used the reports to evaluate her for a potential loan. At the time Infinity utilized the reports from the CRAs, Ms. Beckford had not yet applied for any credit from Cash Aisle or engaged in any other action which would have created legal permissible purpose for Infinity to use Ms. Beckford's CBRs.

254. Infinity's conduct was willful, as it intentionally designed the software which analyzed Ms. Beckford's credit information *for* businesses such as Cash Aisle,

knowing full well that in the majority of circumstances, the data being analyzed came from CBRs which were obtained illegally. Infinity knew its clients obtain great numbers of leads from deceptive "lead generators," run credit reports on these leads, and then solicit the "qualifying" consumers to obtain loans at rates frequently exceeding 600% interest. Its software would not function without the data provided from the illegally obtained CBRs.

255.    As a result of its conduct, Infinity is liable to Ms. Beckford pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. Beckford respectfully requests this Honorable Court enter judgment against Infinity for:

a.    The greater of statutory damages of $1,000 per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A) (for a total of **$4,000**) or Ms. Mitchell's actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Punitive damages pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d.    Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ms. Beckford hereby demands a jury trial on all issues so triable.

Respectfully submitted on **November 18, 2020**, by:

**SERAPH LEGAL, P. A.**
/s/ *Brandon D. Morgan*
Brandon D. Morgan, Esq.
FL Bar # 1015954
bmorgan@seraphlegal.com
/s/ *Thomas M. Bonan*
Thomas M. Bonan, Esq.
FL Bar # 118103
tbonan@seraphlegal.com
2002 E. 5th Ave., Suite 104
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

## ATTACHED EXHIBIT LIST

A       Image of 597 Peace Pipe Rd., Lac du Flambeau, WI 54538
B       LDF Holdings Website – Operations Team Excerpt, Accessed April 30, 2020
C       LinkedIn.com Profile of Jessi Lorenzo, Accessed April 30, 2020
D       July 2013 *Inwewin* Article
E       Home page for infinityels.com
F       Domain Registration for infinityels.com
G       Archived webpage for paydayloanmanager.com, February 23, 2015
H       Infinity's Server Used for Multiple Payday Loan Websites, including Cash Aisle
I       Dean Financial's Wisconsin License to Operate as a Loan Company
J       Bartlett-Owned AAA Community Finance Address and Phone Number
K       Ms. Beckford's Trans Union Consumer Disclosure, June 10, 2020, Inquiries
        Excerpt
L       Ms. Beckford's FactorTrust Consumer Disclosure, June 10, 2020, Excerpt
M       Ms. Beckford's Experian Consumer Disclosure, July 6, 2020, Inquiries Excerpt